THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PEDRO CARILLO, Defendant-Appellant.

Fifth District   No. 5—99—0512

Opinion filed June 21, 2001.

Daniel M. Kirwan and Larry R. Wells, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Brian Trambley, State's Attorney, of Vienna (Norbert J. Goetten, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

Many of our penal institutions allow family and friends to visit prisoners. In order to ensure prison safety and security, the law prohibits those visitors from bringing certain things with them when they come into the penal institution (720 ILCS 5/31A—1.1(a)(1) (West 1996)). Even if those things are not brought inside, no one must leave them in a place where an inmate could potentially gain access to them. 720 ILCS 5/31A—1.1(a)(3) (West 1996). These prohibitions extend beyond penitentiaries and apply to any place that houses prisoners. 720 ILCS 5/31A—1.1(c)(1) (West 1996).

Over the years, legislators have added to the list of items of contraband. See 720 ILCS 5/31A—1.1(c)(2) (West 1996). The list now includes a number of things that lawmakers do not want inmates to have, even though the items are perfectly legal for anyone to possess outside of a prison environment. Thus, in addition to obvious contraband like illegal drugs or firearms, visitors must refrain from bringing a host of intrinsically innocent items with them when they enter a jail or a prison.

The most notable example of items that people routinely carry with them, but must not carry into a jail or a prison, is "[e]lectronic contraband." 720 ILCS 5/31A—1.1(c)(2)(xi) (West 1996) (as amended by Pub. Act 89—688, eff. June 1, 1997). In order to deny prisoners the ability to freely communicate with the outside world, the legislature added devices like cellular phones, computers, and pagers to the contraband list. They can no longer be brought into a penal institution without committing a Class 1 felony offense. Additionally, legislators wanted to bring within the ambit of the law's prohibition certain items that prisoners could easily convert into lethal weapons. Such things as broken bottles and safety flares were expressly added to the contraband list (720 ILCS 5/31A—1.1(c)(2)(v), (c)(2)(vi)(B) (West 1996)), while the term "weapon" was broadly defined to cover anything from tire irons to golf clubs (720 ILCS 5/31A—1.1(c)(2)(v) (West 1996)).

Certainly, prison visitors would know that the authorities would frown upon them entering a penal institution for a visit and bringing a tire iron or a three-iron along. However, how many visitors would give serious thought about driving onto a visitors' parking lot with such items locked in the trunk of their car?

This is a case where a would-be prison visitor parked his car, locked four cans of beer inside, and attempted to visit an inmate. His conviction for bringing contraband into a penal institution raises the following question: Do people who enter prison grounds and park their cars on designated visitors' parking lots violate the law by leaving contraband items, otherwise legal to possess, safely secured inside their cars during visitation?

The actions prosecuted in this case are brought within the crime's reach by a 1983 decision of this court that equated bringing items of contraband *into* a penal institution with bringing those items *onto* prison grounds. *People v. Turnbeaugh*, 116 Ill. App. 3d 199, 204-05, 451 N.E.2d 1016, 1020 (1983). We must revisit that decision in light of the subsequent expansion of the contraband list. We examine the legislature's desire to deny inmates access to contraband, mindful that under our existing interpretation most prison visitors could be prosecuted for violating the law's prohibition. For example, the severe penalties that accompany a Class 1 felony could befall anyone who drove an automobile fitted with a built-in cellular phone onto a prison parking lot. Moreover, anyone who failed to empty a car trunk of the sundry items that prisoners could easily convert into weaponry could fall prey to a prosecution for bringing contraband into a penal institution. If driving onto prison property in a car that contains contraband constitutes the crime, a car with a trunk that contained tire irons, golf clubs, fishing knives, tools, or safety flares could not be used to visit an inmate without violating the law, even though such items, like the built-in cell phone, could not find their way into prison quarters.

Thus, we must decide what the legislature meant by bringing contraband into a penal institution, in light of the many intrinsically innocent items added to the contraband list, several of which are apt to be found in cars driven by people who want to visit inmates.

Pedro Carillo wanted to visit a cousin confined at the Shawnee Correctional Center. When he entered the prison grounds, a guard told him where to park his car. Pursuant to the guard's directions, Carillo drove to a designated visitors' parking lot. He parked the car, locked it, and walked toward the door where visitors had to enter the prison. Before Carillo could get to the entrance, a guard appeared and asked for permission to search his car. Carillo consented. The guard promptly discovered a paper sack in the back of the car. When he looked inside, the guard found four unopened cans of beer.

Although it is legal to possess unopened cans of beer inside a car, alcoholic liquor is an item of contraband prohibited from being brought into a penal institution (720 ILCS 5/31A—1.1(c)(2)(i) (West 1996)). Carillo was tried and convicted of the offense. He appeals his conviction. This is his position:

"[T]he statute prohibiting the bringing of contraband into a penal institution was not violated by Mr. Carillo leaving four beers on the floorboard of his car when he entered the prison visitors' parking lot. Mr. Carillo either did not bring beer into a prison[ ] or *** was given authority to possess such innocent items by the prison providing him a place to park his car. *** However, assuming that the contraband statute was intended by the legislature to apply to a prison visitors' parking lot, that statute is unconstitutional. Since the statute provides that it is violated upon bringing prohibited items 'into' the prison, Mr. Carillo reasonably believed that he was complying when he left his car to go into the prison, while leaving the prohibited item (beer) behind, locked in his car. That belief is what a person of common intelligence would conclude from reading the statute. Consequently, a contrary reading makes the statute unconstitutional. If the statute applies to a visitors' parking lot, then it is absurd, since the list of prohibitions would, for all practical purposes, include the entire automobile, from the spring steel in the seats (handy for making shanks) to the antennae (a great start for making a zip gun). A statute which makes a car illegal to have in a parking lot is absurd and void. If the statute applies to a parking lot, then it would criminalize conduct which is entirely innocent, performed with no wrongful intent—like having a beer locked in one's car while one goes into prison to visit one's cousin[ ] or having a flare gun in one's trunk stored in the fancy traffic safety box one bought from the Auto Zone. Finally, if everyone violates this law when he parks in a prison visitors' parking lot, then no one is safe. Human nature being what it is, the unpopular, the poor, the Hispanic, the Black, the merely rude, [or] the man who reminds a guard of a fellow who took his best girlfriend[ ] will have the statute enforced against him. Such a program is not constitutional. The rule of law requires notice, rational application, and fair play. This Court should either hold that the contraband statute does not apply to prison visitors' parking lots[ ] or strike the statute as unconstitutional."

The State counters as follows:

" 'It cannot be doubted that preventing inmates from gaining access to contraband is a valid State objective.' [Citation.] As the Supreme Court has noted, section 31A—1.1 has been reasonably designed to insulate the penal environment from the harmful attributes of the prohibited items. [Citation.]

Given this insight into the legislative intent of section 31A—1.1, it is apparent that the legislature was concerned about keeping contraband away from inmates while they were imprisoned. Since prisoners at [Shawnee Correctional Center] routinely work in the prison parking lot (as they did in *Turnbeaugh*), the legislature intended that the law prevent inmates from gaining access to contraband while they are working in the parking lot. Any other interpretation wold [*sic*] render sub[ ]section 31A—1.1(a) absurd and overlook the reason and necessity for the law and the evil to be remedied. [Citation.]"

The State further maintains that our reading of the legislature's intent, as explained in *People v. Turnbeaugh*, properly supports Pedro Carillo's conviction for bringing contraband into a penal institution. It argues that our 1983 view of the statute controls the outcome of this case.

We review our earlier decision.

William Turnbeaugh was traveling an access road that led to Graham Correctional Center when prison authorities stopped his car, about 50 feet from the institution's parking lot and approximately 300 yards from the prison's front door. *Turnbeaugh*, 116 Ill. App. 3d at 201, 451 N.E.2d at 1018. The guards found a bag of marijuana in his car, and Turnbeaugh was subsequently convicted of bringing contraband into a penal institution. *Turnbeaugh*, 116 Ill. App. 3d at 200-01, 451 N.E.2d at 1018. On appeal, we held that Turnbeaugh did not have to pass through a portal in order to bring contraband "into" a penal institution. *Turnbeaugh*, 116 Ill. App. 3d at 204, 451 N.E.2d at 1020. It was sufficient that he drove onto the institution's property with contraband in his car. *Turnbeaugh*, 116 Ill. App. 3d at 205, 451 N.E.2d at 1020-21.

This reading of the crime's scope was premised upon prisoner access to the area where Turnbeaugh's car was stopped and searched. In light of the evil to be remedied—prisoner access to contraband items—we noted:

"It is uncontradicted that defendant was apprehended upon institution grounds; and there was ample testimony at trial that institution work details had access to the grounds beyond the perimeter fence surrounding the buildings themselves." *Turnbeaugh*, 116 Ill. App. 3d at 204, 451 N.E.2d at 1020.

Here, no one disputes that institution work details had access to the visitors' parking lot. That fact plays a prominent role in the State's argument. Notwithstanding, Pedro Carillo claims that he has violated no law. He maintains that *People v. Turnbeaugh* was wrongly decided, but he adds that if the case did correctly decipher the legislature's

intentions, the crime's reach runs afoul of the constitutional guarantee to due process of law.

●1, 2 All statutory enactments are entitled to a strong presumption of constitutionality. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 377, 689 N.E.2d 1057, 1063 (1997). If reasonably possible, we interpret statutes in such a way as to uphold their constitutionality. *People v. Davis*, 93 Ill. 2d 155, 161, 442 N.E.2d 855, 858 (1982). We can clearly do so in this case.

The following is well-settled:

> "[A] criminal or penal statute is to be strictly construed in favor of an accused, and nothing is to be taken by intendment or implication against him beyond the obvious or literal meaning of such statutes. [Citations.] This is so *** because 'the penal law is intended to regulate the conduct of people of all grades of intelligence within the scope of responsibility,' and it is therefore 'essential to its justice and humanity that it be expressed in language which they can easily comprehend; that it be held obligatory only in the sense in which all can and will understand it.' " *People v. Eagle Food Centers, Inc.*, 31 Ill. 2d 535, 539, 202 N.E.2d 473, 475 (1964), quoting 2 J. Sutherland, Statutory Construction § 520 (2d ed. 19___).

When the legislature designed this crime, prohibiting anyone from bringing contraband into a penal institution, the term "penal institution" was defined as "a penitentiary, state farm, reformatory, prison, jail, house of correction, or other institution for the incarceration or custody of persons under sentence for offenses or awaiting trial or sentence for offenses." Ill. Rev. Stat. 1983, ch. 38, par. 2—14. The definition did not mention anything about prison property, grounds, or parking facilities, but certainly such areas, not directly related to the actual incarceration or custody of inmates, are a part of most penitentiaries. Hence, the legislature may well have intended to outlaw the bringing of contraband onto any prison ground, not just into the buildings that actually house prisoners. However, it created an ambiguity when it prohibited bringing contraband "into" a penitentiary or a jail without specific mention of bringing contraband "onto" the grounds that surround some of those facilities.

In *People v. Turnbeaugh*, we did not resolve this ambiguity strictly in favor of the accused. In fact, rules of statutory construction were neither discussed nor applied. In dealing with an inherently illegal substance, we did not try to reconcile the language that the legislature chose to use with the conduct Turnbeaugh had engaged in. Rather, we focused upon the purpose of banning certain items from places that house prisoners. By implication, we found that the legislature wanted

to prohibit contraband from areas outside of prison buildings and beyond prison walls, provided that prison labor might frequent such environs. While the legislature clearly said that it was a crime to bring contraband *into* a jail, a prison, or other institution *for the incarceration or custody* of persons, we found that it wanted to ban certain items from all prison property, even areas where prisoners are not incarcerated and areas where they cannot tread absent strict supervision.

Turnbeaugh committed a crime by possessing cannabis. It was not a cell phone or a can of beer that he was transporting. This fact certainly played a part in our earlier decision upholding his conviction for the crime of bringing contraband into a penal institution. Nonetheless, we were not presented with an identical question in that case. Turnbeaugh was stopped before he could park his car and lock its contents inside. The cannabis was not found inside the car's trunk. We did not consider the question of how prisoners on work detail might have accessed the contraband locked inside of Turnbeaugh's car.

The word "into" has a plain and simple meaning. When the legislature outlawed bringing contraband "into" a jail, a prison, or other institution for the incarceration or custody of persons, it seemed to call for some passage through a door or gate into areas where security and safety are a concern. Had the legislature wanted to keep certain items off of the property that lies beyond a facility that houses prisoners, it could easily have said so.

This meaning has become even clearer by virtue of the legislature's expansion of the contraband list to include numerous items that people routinely keep in their automobiles. The inclusion of many items that are intrinsically innocent in nature clearly evinces a design to keep people from bringing contraband into those facilities directly related to prisoner incarceration—a design to have people leave their cell phones, laptop computers, and pagers securely locked inside of their cars when they enter a prison building for a visit.

Given the kinds of items that now compose the statute's expansive contraband list, the crime of bringing contraband into a penal institution must receive a strict and narrow reading to preserve its validity. It cannot be read with intendment or implication beyond its obvious and literal meaning. Moreover, another change in the statute clearly supports a narrower view than the one taken in *People v. Turnbeaugh*.

When the legislature expanded the contraband list, it also amended the definition of "penal institution." That term is now defined as "any penitentiary, State farm, reformatory, prison, jail, house of correction, police detention area, half[ ]way house[,] or other institution or place

for the incarceration or custody of persons \*\*\*; provided that where the *place for incarceration or custody* is housed within *another public building*[,] this Act shall not apply *to that part of such building unrelated to the incarceration or custody of persons.*" (Emphasis added.) 720 ILCS 5/31A—1.1(c)(1) (West 1996). The legislature appears to be speaking about the buildings where inmates are held captive. If the confinement areas are but a part of another building, it is not a crime to possess contraband in areas not dedicated to captivity, even though inmates might have restricted access to those areas.

Thus, attorneys can carry their cell phones and pagers all about the courthouse, so long as they do not bring them into a pretrial-detainee holding facility. They can even have them in a courtroom—an area where prisoners are given restricted and supervised access—without offending the law.

This new passage helps to clarify what the legislature meant by bringing contraband into a penal institution. The law will tolerate a drive onto a county jail parking lot with a cell phone, laptop computer, pager, or even four cans of unopened beer inside of the car. The same attorneys who are free to roam courtrooms in possession of cell phones can visit their clients at a county jail or prison and use the visitors' parking lot with their cell phones still nearby. They do not offend the law unless they bring those cell phones into that part of the county jail building related to the incarceration or custody of inmates.

The legislative design of this statute is to keep contraband out of those places related to inmate confinement—buildings where they are incarcerated. Bringing contraband into the facilities that actually house prisoners is the evil intended to be remedied by criminal penalty.

The State emphasizes the fact that prison work details have access to areas that the Shawnee Correctional Center dedicates to prison visitor parking. The prison uses prison labor to keep the areas clean. Relying upon the reasoning employed in *People v. Turnbeaugh*, the State concludes that prisoner access to the parking lot conveys access to the contents of cars parked there. It follows that allowing the contraband to be brought onto the parking lot would permit the evil that the legislature intended to remedy.

Initially, we are not presented a case where a visitor popped the trunk of his car or left the car unlocked before entering the prison for a visit. Since prisoners work on the parking lot, leaving contraband in an unlocked car might evoke that portion of the statute that prohibits placing an item of contraband in such proximity to a penal institution as to give an inmate access to the contraband. Here, the beer was securely locked inside the car before the car was left unattended on the parking lot.

In any event, the fact that prison labor is used to clean parking lots does not mean that prison workers gain access to cars or their contents. The workers gain access to the parking lot, but there is no access to the contents of a car without committing a burglary, presumably in the presence of supervisors.

Prison labor is not unsupervised, particularly when the work is performed beyond prison walls and within reach of a motor vehicle. We cannot imagine that prison authorities would allow unrestricted movement around unattended cars parked outside prison restraints. After all, a few of the inmates housed in our penitentiaries know how to start a car without the use of a key. We will not presume that the contents of unattended cars parked on a prison parking lot are accessible to prison workers by virtue of a work detail to clean the area. Prison authorities will take whatever precautions are needed to keep the unattended cars completely secure.

Finally, we agree that a broader reading of the statute would present a serious question of constitutionality.

●3 The United States Supreme Court noted long ago: "If the legislature undertakes to define by statute a new offence[ ] and provide for its punishment, it should express its will in language that need not deceive the common mind. Every man should be able to know with certainty when he is committing a crime." *United States v. Reese*, 92 U.S. 214, 220, 23 L. Ed. 563, 565 (1876). Most people of common intelligence would understand that it is against the law to bring a safety flare, a tire iron, or even a golf club with them when they walk into a prison facility for a visit. However, few would think to empty such sundry items of contraband from the trunk of their car before embarking on a prison visit with family or friend. Moreover, reasonable minds might fairly conclude that keeping the contents of their car secure would prevent those contents from forming the basis of a criminal prosecution. Even those learned in the law—the attorneys who frequent penitentiaries and county jails every day—might reasonably think that they could leave their cell phones, laptop computers, and pagers locked inside of their cars, parked on a jail parking lot, without a risk of prosecution for committing a Class 1 felony.

●4 Few people of common intelligence would know that driving onto a visitors' parking lot with items that are legal to possess outside of a jail or a prison violates a law that prohibits "bringing contraband into a penal institution." Most people would think that they could comply with the law by leaving items that authorities did not want them to bring into the penal institution securely locked inside of their cars. The construction of the statute used to convict Pedro Carillo would deceive many a well-minded person and allow for unnoticed and unwitting criminal sanction.

What the common mind would understand as being required by this law is what the legislature intended to require. Pedro Carillo clearly knew that he could not bring a beer with him when he locked his car and attempted to enter the prison for a visit with his cousin. When he secured the beer, he was trying to comply with the law, and so he did. He prevented any inmate from gaining access to the forbidden beer. His thinking and his actions were of a kind that our legislators wanted to promote rather than punish.

Since Pedro Carillo did not violate the law's ban on bringing contraband into a penal institution by parking his car on a visitors' parking lot and leaving four unopened cans of beer locked inside, his conviction must be reversed.

Reversed.

CHAPMAN, P.J., and GOLDENHERSH, J., concur.