THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL CHRISMAN *et al.*, Defendants-Appellants.

Fifth District   No. 5—01—0343

Opinion filed October 29, 2002.

Daniel M. Kirwan, of State Appellate Defender's Office, of Mt. Vernon, and Curtis L. Blood, of Collinsville, for appellants.

Brian Trambley, State's Attorney, of Vienna (Norbert J. Goetten, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

George and Michael Whittier, Kevin Barbic, Michael Chrisman, and David Hawkins found friendship back in their glory days at Bloom-

ington High School in the mid-nineties. They traveled life's journeys together until sometime prior to September of 2000, when the State of Illinois removed David Hawkins from his home in Bloomington and placed him in a prison cell. We do not know precisely when or why. We do know that after a prison stint of unknown duration, Hawkins was scheduled for release from Shawnee Correctional Center (Shawnee) on the morning of September 20, 2000.

Barbic, Chrisman, and the two Whittier brothers were not fine-feathered friends. As soon as September 20, 2000, arrived, the foursome hopped into Barbic's minivan and drove the several hundred miles south, from Bloomington to Shawnee. They drove throughout the night and into the dawn for a welcomed reunion with their fallen comrade. They wanted to celebrate the moment, share in his rendevous with freedom, and take him back home to Bloomington. However, there would be no celebration that day. When the sun set on September 20, 2000, David Hawkins was the only one not confined to a jail cell.

The van arrived at Shawnee a few hours prior to Hawkins' scheduled release. Having been told that there would be a considerable wait before the release, the foursome drove to a nearby McDonald's restaurant and ate some breakfast. When they returned to the prison, George Whittier drove the minivan onto the prison grounds and parked it in the visitors' parking lot. A prison official told them to close all of the van's windows and to lock the van's doors. They complied with the request to secure their vehicle and walked to the gatehouse door in an attempt to be in the visitors' center when Hawkins was freed.

Chrisman had partied at the Lizards Lounge in Bloomington until shortly before he, Barbic, and the Whittier brothers journeyed south to pick up Hawkins. On the way to Shawnee he slept off the effects of some rather heavy drinking. However, he still smelled of alcohol when he walked into the visitors' center. Someone reported the smell to prison officials. They summoned Johnson County deputies to search Barbic's minivan. Barbic repeatedly refused their requests for a consent to search, until he was shown a sign at the prison entrance that warned everyone that they and their cars were subject to being searched. After the authorities explained that he had no privacy right to assert when on prison grounds, Barbic opened the van and agreed to the search. The search uncovered a small bag of marijuana under the driver's seat and a half-empty bottle of cheap rum in a cooler in the back of the van. The Whittier brothers, Barbic, and Chrisman were immediately placed under arrest.

The State bypassed a prosecution for unlawful possession of cannabis and transporting open liquor in a motor vehicle, opting to charge

all four travelers with the commission of two felony offenses. A two-count information was filed, charging the Whittier brothers, Barbic, and Chrisman with bringing contraband into a penal institution. The first count was predicated upon the small bag of marijuana; the second count dealt with the bottle of rum. The charges were brought under section 31A—1.1(a)(3) of the Criminal Code of 1961 (720 ILCS 5/31A—1.1(a)(3) (West 1998)), a section that covers situations where contraband is not brought into a penal institution but, rather, is placed near enough to the facility that prisoners could get their hands on it. Both counts alleged that the defendants knowingly placed contraband in such proximity to a penal institution as to give inmates access to the contraband.

George Whittier pled guilty. During the trial of Barbic and Chrisman, he was called by the defense and claimed sole ownership of the marijuana. He testified that the 11 grams seized by prison officials were all that remained from a $90-ounce purchase that he alone had made four days prior to the trip. He told the jury that no marijuana had been consumed in the van during the night's journey en route to the prison. Whittier apparently did not want to have marijuana in his pocket when he went into the prison. He testified that he decided to slip the small bag under the driver's seat of Barbic's van while Barbic, Chrisman, and his brother slept.

Barbic testified in his own defense that he did not know that the marijuana was in the van. He also claimed that he had forgotten about the presence of the rum, which had been in the van for several days.

Chrisman also testified. He disavowed any knowledge of the marijuana or the rum. In a statement made to the authorities shortly after his arrest, he admitted knowledge of the rum. Chrisman tried to explain the earlier admission. He testified that Barbic told him about its presence only shortly before deputies were about to search the van. He insisted that he did not know it was there when he entered the prison or left the van to meet with Hawkins. Barbic corroborated this claim, stating that he disclosed the existence of the rum to Chrisman only moments before its discovery.

The State presented evidence that, as a matter of general prison routine, inmate work crews have access to the parking lot. The State did not present evidence that a specific work detail was assigned work on the parking lot on September 20, 2000. In fact, there was never any inmate on the parking lot the day in question.

The jury found Barbic guilty on both counts of the information. It acquitted Chrisman of knowingly providing inmate access to marijuana but found him guilty of giving inmates access to rum. Barbic and Chrisman were placed on probation and fined. They appeal their convictions.

There is but one challenge on appeal. Both appellants question whether the State established, beyond a reasonable doubt, that they provided inmates access to prison contraband.

There is no dispute over the fact that marijuana and rum constitute items of prison contraband. Nor is there any question that the contraband was inside the van while it rested on the prison parking lot. While their knowledge of the contraband's presence inside the van was contested at the trial, neither Barbic nor Chrisman raises a challenge to a finding of knowledge, implicit in the jury's verdicts.

■ The sole question that we are asked to decide is whether the State proved, beyond a reasonable doubt, that either Barbic or Chrisman knowingly placed marijuana or rum in such proximity to prison confines as to give prisoners access to the marijuana or the rum. In weighing the legal sufficiency of the State's evidence, we always view that evidence in a light most favorable to the State and ask whether any rational trier of fact could reach a finding of guilt based upon it. *People v. Ortiz*, 196 Ill. 2d 236, 259, 752 N.E.2d 410, 425 (2001). Here, the answer depends upon whether the prohibition against "knowingly *** plac[ing] an item of contraband in such proximity to a penal institution as to give an inmate access to the contraband" (720 ILCS 5/31A—1.1(a)(3) (West 1998)) is broad enough to encompass a securely locked van parked on a designated prison visitors' parking lot.

The appellants' argument is essentially this: George Whittier parked in an area designated for all visitor vehicles. Logically, people would believe that prison officials would make such an area secure and safe for unattended vehicles, free from any criminal element that abounds within the neighboring facilities. Anyone who parked where prison officials wanted them to park would think that the vehicles themselves, as well as their contents, would be off-limits to prisoners. Whittier did not park where he did in order to allow prisoners to access contraband.

No one arrived with an intention of smuggling contraband to inmates or with any knowledge that parking in a designated visitors' parking lot would provide an inmate access to the van. It was undisputed that the sole purpose of the trip was to take a released friend home.

More importantly, since everyone complied with the request to secure the van after parking in the designated area, whatever limited access inmates in a work detail may have had to the van or other visitors' vehicles, access to the van's contents was completely cut off. The marijuana and rum became inaccessible to inmates when those items were securely locked inside the vehicle. The only way an inmate could gain access to the marijuana or the rum would be to forcibly break

into and burglarize the vehicle, an event too remote and too unforeseeable for an attribution of criminal liability. The legislature did not contemplate such a broad reading of the statutory provision making it a crime to give prison inmates access to contraband.

No one parking on a designated parking lot would contemplate the limited inmate access that prison officials allowed. Even if they did, the evidence demonstrated that inmates are either under direct supervision or under constant surveillance when working in the vicinity of motor cars. The State failed to establish that any prisoner would be permitted to go near a vehicle, much less engage in an effort to board it.

Based upon this position, the appellants tender the following conclusion. Because the designated visitors' parking lot is a considerable distance from the walls and fences that confine prisoners, because parked vehicles are off-limits to working inmates, because the van in question was secured against entry by anyone, and because no inmate was ever anywhere in the vicinity of the van, no rational juror could find, beyond a reasonable doubt, that the defendants knowingly parked where they did so as to give inmates access to marijuana or rum.

The State's view differs. It maintains that the prohibition against placing contraband in such a position as to provide accessibility to inmates necessitates only the proof of a common practice that provides inmates access to the area where vehicles are parked. Since the prison allows inmates to work on the parking lot, any visitor who parks his or her car on that lot with an item of prison contraband inside places that contraband in such proximity to a penal institution as to give access to an inmate.

Because the evidence established that Shawnee Correctional Center authorities routinely allow prison work details access to the parking lot, the State argues that any contraband locked inside a vehicle on that lot is accessible to inmates for purposes of the law's prohibition. The fact that inmates would not be permitted to get near any of the vehicles by guards supervising their work, or guards watching their activities from towers, is not germane to the inquiry. It is irrelevant that inmates would have to break into the locked vehicle in the presence of officials who would immediately put a stop to such activity. Nor does it matter that Barbic and Chrisman were completely ignorant of the fact that inmates frequented the parking lot and could, therefore, get within reach of the van or that the contraband was irrefutably beyond the reach of any prisoner and totally secure on the day in question. All that matters is that contraband was left where it could, conceivably, under the right circumstance and breach of security, find its way into the hands of a rogue prisoner.

For the following reasons, we reverse.

■ The statutory provision under which Barbic and Chrisman were prosecuted reads as follows:

"A person commits the offense of bringing contraband into a penal institution when he knowingly and without authority of any person designated or authorized to grant such authority (1) brings an item of contraband into a penal institution or (2) causes another to bring an item of contraband into a penal institution or (3) places an item of contraband in such proximity to a penal institution as to give an inmate access to the contraband." 720 ILCS 5/31A—1.1(a) (West 1998).

In *People v. Carillo*, 323 Ill. App. 3d 367, 751 N.E.2d 1243 (2001), we reversed a similar conviction for bringing contraband into a penal institution. Pedro Carillo entered the Shawnee Correctional Center and parked his car on the same designated visitors' parking lot at issue here. *Carillo*, 323 Ill. App. 3d at 369, 751 N.E.2d at 1245. He had four unopened cans of beer in a paper bag inside his car. He locked the car and walked towards the visitors' center for a visit with his cousin. Prison officials requested a consent to search Carillo's vehicle, and he consented. After the search yielded the four cans of beer, Carillo was prosecuted for and convicted of bringing contraband into a penal institution, a Class 4 felony. *Carillo*, 323 Ill. App. 3d at 369-70, 751 N.E.2d at 1245-46.

Unlike the allegation lodged against Barbic and Chrisman, Carillo's charge alleged that he knowingly brought contraband into a penal institution, rather than placing it where prisoners could gain access to it. Although we are presented with different alleged criminal conduct, the reasoning that led to our decision in *People v. Carillo* aptly fits the particulars of this case as well. The same constitutional concerns, raised and avoided by our statutory construction there, are implicated by virtue of the position the State maintains here.

We start with a simple observation. If the legislature wanted a blanket prohibition against the possession of contraband in any motor vehicle driven onto prison grounds, it would be easy for some legislator to put that desire into words. However, because of all of the things that presently constitute prohibited contraband, a *per se* ban against driving onto prison grounds with an item of contraband in a car or its trunk would create a serious practical problem. Most people routinely carry certain items in their cars that easily fit within the present definition of contraband. Moreover, a complete ban of contraband items would have no bearing on the evil that the crime was designed to cure—prisoner access to things that we do not want in the hands of confined criminals.

It is the expansive contraband list, which includes a host of things that are entirely legal to possess, things that are also commonly carried in motor vehicles or their trunks, that requires a limited view of what conduct is necessary in order to make contraband accessible to inmates. Over the years, our legislature has expanded the statutory definition of prison contraband, providing a comprehensive list of things that it wants to keep beyond the reach of prison inmates. As we pointed out in *People v. Carillo*:

"In order to deny prisoners the ability to freely communicate with the outside world, the legislature added devices like cellular phones, computers, and pagers to the contraband list. They can no longer be brought into a penal institution without committing a Class 1 felony offense. Additionally, legislators wanted to bring within the ambit of the law's prohibition certain items that prisoners could easily convert into lethal weapons. Such things as broken bottles and safety flares were expressly added to the contraband list [citation], while the term 'weapon' was broadly defined to cover anything from tire irons to golf clubs [citation]." *Carillo*, 323 Ill. App. 3d at 368, 751 N.E.2d at 1244-45.

If cell phones, pagers, laptop computers, tire irons, golf clubs, marijuana, or rum, locked inside of a motor vehicle on a designated visitors' parking lot, create a hazard that needs a cure, it is an evil that commends a statutory amendment rather than an untenable view of what the present statutory language outlaws. Were we to hold that the conduct in this case gave an inmate access to contraband, we would have to question the constitutional validity of the statute, something easily avoided by a narrower reading of accessibility. We do not think the legislature intended to outlaw parking a motor vehicle where it is presumptively off-limits to prisoners—a parking lot prison officials require visitors to use—and locking a cell phone inside before leaving the vehicle unattended. The State thinks the legislature wanted people prosecuted for a Class 1 felony offense if they engaged in such behavior. As we pointed out in *People v. Carillo*, such a view would raise constitutional concerns:

"The United States Supreme Court noted long ago: 'If the legislature undertakes to define by statute a new offence[ ] and provide for its punishment, it should express its will in language that need not deceive the common mind. Every man should be able to know with certainty when he is committing a crime.' [Citation.] Most people of common intelligence would understand that it is against the law to bring a safety flare, a tire iron, or even a golf club with them when they walk into a prison facility for a visit. However, few would think to empty such sundry items of contraband from the trunk of their car before embarking on a prison visit

with family or friend. Moreover, reasonable minds might fairly conclude that keeping the contents of their car secure would prevent those contents from forming the basis of a criminal prosecution. Even those learned in the law—the attorneys who frequent penitentiaries and county jails every day—might reasonably think that they could leave their cell phones, laptop computers, and pagers locked inside of their cars, parked on a jail parking lot, without a risk of prosecution for committing a Class 1 felony." *Carillo*, 323 Ill. App. 3d at 375, 751 N.E.2d at 1250, quoting *United States v. Reese*, 92 U.S. 214, 220, 23 L. Ed. 563, 565 (1876).

When we decided *People v. Carillo*, we also addressed the State's method of proving inmate access:

"The State emphasizes the fact that prison work details have access to areas that the Shawnee Correctional Center dedicates to prison visitor parking. The prison uses prison labor to keep the areas clean. \*\*\* [T]he State concludes that prisoner access to the parking lot conveys access to the contents of cars parked there. It follows that allowing the contraband to be brought onto the parking lot would permit the evil that the legislature intended to remedy.

Initially, we are not presented a case where a visitor popped the trunk of his car or left the car unlocked before entering the prison for a visit. Since prisoners work on the parking lot, leaving contraband in an unlocked car might evoke that portion of the statute that prohibits placing an item of contraband in such proximity to a penal institution as to give an inmate access to the contraband. Here, the beer was securely locked inside of the car before the car was left unattended on the parking lot.

In any event, the fact that prison labor is used to clean parking lots does not mean that prison workers gain access to cars or their contents. The workers gain access to the parking lot, but there is no access to the contents of a car without committing a burglary, presumably in the presence of supervisors.

Prison labor is not unsupervised, particularly when the work is performed beyond prison walls and within reach of a motor vehicle. We cannot imagine that prison authorities would allow unrestricted movement around unattended cars parked outside prison restraints. After all, a few of the inmates housed in our penitentiaries know how to start a car without the use of a key. We will not presume that the contents of unattended cars parked on a prison parking lot are accessible to prison workers by virtue of a work detail to clean the area. Prison authorities will take whatever precautions are needed to keep the unattended cars completely secure." *Carillo*, 323 Ill. App. 3d at 374-75, 751 N.E.2d at 1249-50.

Here, the State went a step further in trying to establish why

people could not leave contraband items locked inside their vehicles when parked in the designated visitors' parking lot. Apparently, Shawnee Correctional Center authorities actually allow unsupervised inmates to trek across the designated visitors' parking lot. Although the testimony of that fact is somewhat surprising, it does not change our view about the inaccessibility of items locked inside any motor vehicle on that lot. We adhere to the view that "authorities will take whatever precautions are needed to keep the unattended cars completely secure." *Carillo*, 323 Ill. App. 3d at 375, 751 N.E.2d at 1250. The prison official who testified about limited, unsupervised inmate access to the parking lot was not asked about the screening process that an inmate goes through before he is allowed to stroll outside prison walls unsupervised. We assume that before an inmate would qualify for that degree of freedom, authorities would have a very high level of official confidence in such an individual's behavior. Even so, the evidence further established that the visitors' parking lot is under constant surveillance from several guard towers. If a trusted inmate was seen trying to pry open a locked vehicle or otherwise trying to board it, we would expect the guards to prevent entry, with a show or use of force, if necessary.

■ "Access" is a word used in many contexts, having many meanings. When we examine its various uses, we think that access to the van itself would mean "permission, liberty, or ability to enter." Webster's Third New International Dictionary 11 (1986). When used in the statutory phrase "as to give access," the word would appear to mean "freedom or ability to obtain or make use of." Webster's Third New International Dictionary 11 (1986). The evidence did not establish that any prison inmate, hypothetically present on the visitors' parking lot, would have had permission to enter Barbic's locked van. Moreover, we find nothing in the State's case that establishes that either Barbic or Chrisman gave inmates the freedom or ability to obtain or make use of the marijuana or the rum. Contraband is not free to obtain when locked up in a motor vehicle on a parking lot dedicated by prison officials for unattended visitors' vehicles.

Because we find that, based upon the evidence presented, no rational trier of fact could find beyond a reasonable doubt that either Barbic or Chrisman knowingly placed contraband in such close proximity to a penal institution as to give an inmate access to the contraband, we reverse their convictions.

Reversed.

MAAG, P.J., and HOPKINS, J., concur.